All right, Mr. Falcon, we're ready for you. So, I'll start in this case, this case is controlled by a U.S. Supreme Court President in the Jones and Laughlin Steel Corp. v. Pfeiffer, and the language that we'll start with, and I'm going to come back in my argument to the legal part a little bit later, but I'm going to talk first about the past loss wages and the fact the jury gave this gentleman zero past loss wages. But the reason I'm looking at, or like us to look at Pfeiffer, is Pfeiffer's a case that came up in the Supreme Court in between this Court's two Colvert decisions, Colvert I and Colvert II. But the U.S. Supreme Court said in Pfeiffer, which is really important right now to talk about the past loss wages, in calculating damages, it is assumed that if the injured party had not been disabled, he would have continued to work. Simple proposition. It's assumed he would have continued to work, but for the disability. So what do we have here? We have a case where we have, with contested liability, the jury found 100% fault on the employer, Jones Act employer, zero comparative fault on Clinton. So now we've got liability for this accident. What are the damages? Well, uncontested, three medical doctors testified. The company doctor that they sent Clinton to the day after the accident when he took him off the boat, who disabled him for a short period of time until they could find out what was going on with the injury. The treating neurosurgeon who ended up operating on Clinton McGraw, because of the damage to his lower back, instrumentation from a surgery that was done. And the third doctor who testified, that the plaintiffs called in our case, was the defense medical examiner. Dr. Todd examined Clinton McGraw on behalf of United Tugs. We took his deposition, his first report said, this man's injured, he probably needs surgery, and ultimately there was a little bit of dispute whether he needed the surgery or not, but the surgery was done. But what's undisputed from all three of these medical doctors is he will never go back to maritime employment. He will not ever go back to work again. The other undisputed, a little bit of a controversy, but the two vocational rehabilitation counselors. So now that he's hurt, now that he's disabled, what can he do? And the only difference is between a, because he's at light of maybe minimum duty, and because of his educational background, Clinton might be able to earn $7 an hour. And the only dispute, is it up to $10 or is it up to $12? Nothing back close to the money he was earning at the time that he was injured. So let's talk about the money he was earning at the time he was injured. And how he got there, because we're going to get into some averages and what is appropriate amount that we should talk about in this case. Clinton went to an employment agency. He had to get certified by the U.S. Coast Guard to get a TWIC card. The TWIC card said that he was cleared to work offshore in Louisiana through the maritime industry, included a criminal background check. He went to the company, had to get pre-employment physicals. He was cleared, but he had a probationary period with his company. It took two or three months. He worked with a company that was satisfied with his work, and they hired him on permanently. He was employed by the employment agency, and a couple months later, they hired him on permanently with his company. He was making $210 a day. The routine schedule was 28 days on, 14 days off. So for 28 days, Clinton could go out to work and get $210 every day. And guess what? He had no expense. They provided meals, he had a place to live. He came off that boat, he kept all that money to go home and pay for his family and his young son, who he was raising as a single father, actually. So, Clinton is hurt on July 27th. After ten and a half months of going through this routine, ten and a half months. Now, in the beginning, he would go to some different vessels. They would call, he'd get off his boat, they needed somebody on another boat, he'd jump on that boat to pick up the work, because he wanted to prove that he could do this job. He wanted to prove to his company that he was able to do it. And he did. He would go from his boat, pick up another boat, and he'd go to another boat. Finally, after about five or six months, he fell into a routine on the vessel that he was injured on, working for Captain Lapine. So what's good for the company, what's good for Clinton, is you get into this 28 and 14 rotation. So the company knows they have a days after he gets off, and he will be working with Captain Lapine. They get in a rotation where they are, usually lined up where they're working with each other. Clinton got into that routine, and it was ten and a half months later, after he first got hired, is when the accident happened. Ten and a half months. He was one hitch away, one 28-day hitch away from making his first anniversary with his company. Making $210 a day. So he's injured, he goes to the company doctor, he disables him, says get checked out, he gets an MRI, herniated disc, goes through this treatment. The company pays $177,000 of medical cure through cure, under the names of cure. No dispute, stipulated at trial. That's the amount of medical care it took to try to get Clinton back to where he's not healed, he's not able to go back to work. At least they were able to reduce his pain level to where he could function in life. $177,000 of medical bills in this case, undisputed. Nobody's saying this man's going back to work in the maritime industry. But this jury decided, even three years after his accident, he's entitled to zero past lost wages. Zero. And that's the truth. He was on a 28-day hitch when he was injured. There's probably four or five days left in that hitch. So those four or five days, because he was taken off the boat, he should be at least entitled to those four or five days. $210 a day, that's $1,000. That's past lost wages. They gave him zero, none of that. He would have been back after 14 days for another 28-day hitch. He couldn't go back according to the company doctor who So we go through another 20. Then we go through all those rotations until we get to the day of trial. And this is where we go back to the assumption from Pfeiffer that he would have continued to work, but for the disability. But we didn't rest on the assumption. What did we do? When I first took the captain's depositions, both of them, on the day that he was injured, would he still have been able to work for your company? Both of them testified, especially Captain Lapine, who was his direct supervisor, who he worked with the most, said, yes, but for the injury, he would still be working for this company. Undisputed. Nobody has contested that fact. Captain Adams agreed with him. The owner who testified about some other issues never came up with anything from his personnel record, from any discipline, from anything that this man did in those 10 and a half months that would have disqualified him, that would have disputed the factual testimony from the two captains. This man would still be working, undisputed. So from the time of the injury to the time of trial, and these men testified at trial, but for this accident and injuries, disability, he would still be working for his company. That's three years of past lost wages. Those 28 days on 14 off at $210 a day, Clint McGraw is clearly entitled to. We believe it's plain air to have not awarded him anything for past lost wages. So now we get to going forward, and we feel that the award for future wages is also clearly erroneous. It's grossly undercuts what this man is entitled to. And the reason is, and what the argument breaks down to, is what is the determination of the wages used for the calculation? Under Colby, you have four different facts to look at. The second one is, what's the starting point for the lost wages? What Pfeiffer clearly says is you start with the wages at the time of the injury. And we assume that they would continue working at those wages, but for the accident. This court in Culver 2 accepted that language and said clearly, the Pfeiffer Court recognized, as we did in Culver 1, the calculation of lost income stream begins with the gross earnings of the injured party at the time of the injury. It begins there, and then what you do next? To this amount, other income incidental to work, such as fringe benefits, should be added. But what clearly it says in Culver, based on the precedent from the Supreme Court, start with the earnings at the time of the injury. Madour came out between Culver 1 and Culver, I'd say after Culver 2, but the facts were before, but in says again, however, the lost wages is not based on the wage earner's average earnings, but on his earnings at the time of the injury, the moment at which he suffers damages. This is a 1987 opinion, which is around the time that Culver and Pfeiffer are coming out. 1984, I'm sorry. So for over 30 years, we've had this law in the Fifth Circuit. You don't average wages. You use the wages at the time of the injury. The next one, Judge Owen, which you participated in, is Martinez. Martinez, in 2012, affirmed this almost 25 years later. Yes, that's what we do. In fact, what happened, this case is almost on all fours with the case you have in front of you, Your Honor. This was Judge Fallon. Mr. Martinez had worked for 40 years. His average was about $8,000. For the five years before he got hurt, it might have been $5,000. The year that he worked, he made $48,000. And Judge Fallon said, taking on the court's precedent, said, I'm awarding damages based on the $48,000. The defense argued in this court and to Judge Fallon, well, no, no, you've got to take an average. We use an average over time. Look at this man's average over all these years. And this is very clearly, very clearly. Although this was Martinez's last full year of earnings history before his injury, Offshore argues that this amount should not have been used because it is much higher than Martinez's earnings in prior years. That's when they go through the averages. Offshore thus argues that the district court should have based any award for past or future loss wages on a three-year, five-year other average than the plaintiff's total earnings. This court said, and they emphasized this language, calculations of lost income begins with the gross earnings of the injured party at the time of the injury. Emphasis added, at the time of the injury. They rejected Offshore's arguments and they used the earnings at the time of his injury, which is exactly what has to be done in this case. Clinton McGraw has clearly established that he had, at the time of his injury, he was up to ten and a half months, one more hitch, he's had a year, three more hitches, he's at probably the break mark of Martinez. I think most of Martinez had earned those wages over about 14 months. Clinton McGraw is right there. And we have three years later at trial, he still would be earning that money if he hadn't been hurt. So logically, it's four years of earnings at the time of trial that we should be using for his future loss wage claim. But the defense decided to take attack that we're going to use the average and we're going to present to the jury an average. And they came up with the average over the years, $18,000 a year, should be the beginning point of what, of the number that Mr. McGraw should use. Excuse me. And it so happens that their rehab person said that $12 an hour, if he works 40 hours a week, he'll earn $18,000 a year. So his future loss wages should be zero. Fair enough if that was the actual starting point. But that is not the starting point. That is a starting point that is not allowed by this court's precedent. But I will talk about two cases that they can possibly argue may change that. Because what this court has done is, well, what about the case if at the time of the injury, there's inconsistent earnings? Or there's some evidence that the defense could put on or some evidence in the trial that shows that this person may not actually be able to earn the amount of money for that one year period of time, or whatever period of time we're talking about at the time of the injury. But for our case, we know it's ten and a half months, plus the four. Martinez was 14 months. So the In re Parker drilling offshore is this court's case where they said there can be an exception. They talk about it begins at the gross earnings at the time of the injury. But the exception I believe is carved out is when earnings data was inconsistent. That's the language that is in Parker. But what the evidence was in Parker is Campbell, the worker, the plaintiff, Campbell's own expert acknowledged that Campbell was not a 40-hour-a-week worker by any stretch of imagination. So he carved out an exception. Campbell fell through the exception. He was not able to prove that he consistently earned the type of money as Clinton has proved in this case, unrebutted evidence in this case that Clinton has proved. So there may be an exception, but the rule is you use the earnings at the time of the injury. Now there is a case that my opponent has cited. All right, Mr. Falcon, you've kind of exhausted your opening time, taking us back through, so you've got a red light now, but you've reserved your rebuttal time. You want to stop at the end of the sentence you just made, and let's hear from Mr. Ray, and then you've got your rebuttal time intact. All right, thank you. Mr. Ray. Good morning, and may it please the Court. My name is Patrick Ray, and I represent United Tubbs Incorporated, the appellee and cross-appellant in this matter. This case presents a fundamental question in our system of justice, which is how much In this case, the parties agreed upon a jury from the local community, and those jurors took time out of their lives to listen to the evidence over the course of four days. After hearing the evidence, the jury returned a verdict awarding the appellant, Mr. Clinton McGraw, $325,000, $100,000 of which were for lost wages. Unsatisfied with the jury's verdict, McGraw appealed to this Court in search of even more money. McGraw is not the first litigant to be dissatisfied with a jury verdict, and he will not be the last. However, we submit in this case that Mr. McGraw cannot meet his very high burden of showing that the jury had no reasonable basis for the verdict it chose to enter. Now, at the outset, I mentioned the fundamental question presented here, which is how much deference do we give a jury? That question doesn't need to be answered today because this Court has already answered it. The words that have been used to describe the latitude afforded a jury include great, wide, vast, and so on. Mr. McGraw may disagree with the verdict, and, in fact, the distinguished jurists on this panel may feel that they would have ruled a different way, but that's not the test. The test is, is there a reasonable basis in the evidence for the jury's verdict? In this case, the jury awarded Mr. McGraw $100,000 in total lost wages. That figure is within the range presented by the party's expert economists. There's clearly no manifest injustice in this award. More importantly, whether the Court takes a holistic view of the total lost wages awarded or breaks it down into awards for past lost wages and future lost wages, the jury had a reasonable basis for the award rendered based upon the evidence and testimony at trial. I'd like to discuss three key issues today. First, I have to address McGraw's assertion that the methodology employed by UnitedTUG's expert economists was incorrect as a matter of law. I say as a matter of law because Mr. McGraw made no objection to the economist's testimony at trial and filed no motion in limine to exclude or limit his testimony. Accordingly, this is not an evidentiary issue or a review of a decision made by the district judge. Instead, McGraw argues that, by law, the defense economist's methods were inappropriate despite that method being endorsed by numerous courts, including this one. Second, I'll address the evidence supporting the jury's decision to award $0 in past lost wages. That evidence centers around Mr. McGraw's dishonesty when he applied for work at UnitedTUG and his perceived ability to obtain some type of gainful employment after the accident. Third, I'll address the evidence supporting the award of $100,000 in future lost wages. This one is rather straightforward, as the figure awarded was clearly within the range of possible awards presented by the party's economists. With regard to the first issue, the methodology employed by UnitedTUG's expert economist, Dr. Ken Boudreau, was sound. Dr. Boudreau is a professor emeritus of economics at Tulane University, and he's not unfamiliar to the Eastern District of Louisiana or this court. In fact, Dr. Boudreau's method of using an average of the annual income of a litigant to derive a wage base from which to calculate lost wages has been repeatedly accepted and affirmed by this and other courts. We cited to a number of cases in both our principle and reply briefs in which the method of using an average annual income was endorsed, and more specifically, the calculations of Dr. Boudreau himself were endorsed. I refer the court to the Parker drilling case, which is this court's decision in 2009, which did accept the use of an average annual income when the plaintiff's earning history was inconsistent. As Dr. Boudreau explained at the trial of this matter, the method of using an average annual income to derive the wage base is particularly appropriate when the litigant has an On pages 6 and 7 of our reply brief, we provided the court with a chart of Mr. McGraw's earning history. As you can see from the chart, Mr. McGraw was not historically a high wage earner, and his income fluctuated dramatically. This is exactly why Dr. Boudreau used the average income from the three years preceding the accident to calculate Mr. McGraw's lost wages. Faced with the evidence of his sporadic work history, even Mr. McGraw himself could not support his own economist wage base of $51,000, which was more than double the amount that Mr. McGraw had ever earned in one year in his lifetime. Mr. McGraw was asked point blank whether his economist wage base was realistic. In response, Mr. McGraw stood on the witness stand that he could not, couldn't, quote, say what was realistic or not about it, close quote. If Mr. McGraw himself could not support his economist wage base, how could the jury have relied upon it? The fact is that given Mr. McGraw's earning history, the more realistic earnings base was roughly $18,000 calculated by Dr. Boudreau. It was actually a little closer to $19,000. I believe it was roughly $18,800. This average includes the money that McGraw earned at United Tugs. So Mr. McGraw did not lose the benefit of his higher earnings at United Tugs, but Dr. Boudreau presented a more realistic picture of Mr. McGraw's potential earnings. Mr. McGraw admitted that his Social Security earnings record showed that over the course of the last 10 years, he'd worked for 13 different employers. Mr. McGraw was not the type of worker that one could expect to stay on the job for more than a year based on his own admitted employment history. McGraw focuses upon a single line from this Court's ruling in Culver II and discounts all other jurisprudence on this issue. Culver II said that the calculation of a plaintiff's lost income begins with what the plaintiff was earning at the time of the accident. However, this Court's jurisprudence makes clear that the inquiry does not end there. In Parker Drilling, this Court clarified Culver II and held that it was appropriate to use a multiyear average when a plaintiff's earnings history is inconsistent. Now, in Parker Drilling, the issue was whether the plaintiff was a, quote, 40-hour-a-week guy. In this case, the question was, was Mr. McGraw a one-year-at-the-same-employer type of guy? So slight factual distinguishing features there, but the point is that in both cases, the plaintiff had a very inconsistent earnings history, and therefore the method of using an average annual income was found to be appropriate. In Macenter, which was a case cited in my colleague's opposition brief and then addressed in our reply brief, this Court approved of Dr. Boudreau's reduction of the plaintiff's pre-accident income by 25 percent to account for the downturn in the offshore oil industry. Mr. McGraw's proposition that an economist may only use the income being earned at the instant of injury is simply incorrect. The inquiry may begin there, but it is not in there. To require an economist to only focus on what the plaintiff was earning at the moment of injury would often require the economist to ignore the reality presented by the facts of the case. I want to emphasize that Dr. Boudreau's testimony is expert opinion, and the expert is allowed to rely upon any methodology that is generally accepted in his field of expertise. That's exactly what Dr. Boudreau did in this case. So from a substantive standpoint, it is clear that Dr. Boudreau's methodology is sound and consistent with the law of this circuit and consistent with the evidence presented in the case. McGraw now makes a legal argument in which he essentially argues that an economist may never use an average annual income when calculating lost wages and instead must always use the income being earned on the day of the accident. That's not the law, as multiple courts, including this one, have found the method of using an average to be appropriate in circumstances such as that presented in this case. Mr. McGraw has not cited the court to a single case in which an award for lost wages was reversed due to an economist's use of a multiyear average to formulate the earnings base, nor has he cited to any case in which an economist was excluded from testifying due to his use of a multiyear average. Conversely, we've cited the court to several cases in which the use of an average was approved of, including this Court's ruling in Parker Drilling. Mr. McGraw would have the court require that all economists base their loss calculations solely upon what the plaintiff was earning at the moment of injury. In this case, McGraw's proposed earnings base was $51,000, more than twice what he had ever earned during a single year in his lifetime. Mr. McGraw only worked for UnitedTUGS for 10 months. That is not a long-term employee at UnitedTUGS or anywhere else. Therefore, Dr. Boudreau did what the literature in his field suggests by using an average of what McGraw earned in the four years before the trial. From a procedural standpoint, Mr. McGraw failed to challenge Dr. Boudreau's methodology at trial. No motion eliminated was filed, nor was there any traverse of Dr. Boudreau in the stand. There were no questions from McGraw's counsel regarding the appropriateness of using an average, nor was there any objection to Dr. Boudreau's testimony. We respectfully submit that McGraw has waived a right to appeal the methodology used by Dr. Boudreau, and that a party cannot sit idle at trial while an expert gives testimony that he believes is contrary to law, and then appeal the fact that such testimony was given or that the jury relied upon it. In this case, I take it like many. The plaintiff had his expert also, Dr. Gardner, right? Correct. Dr. Gardner testified. Presumably, everybody took all these depositions beforehand, knew what the experts were going to say, so did the jury—I'm thinking Dr. McGraw testified about Dr. Boudreau's methodology and vice versa and all that, and the jury had all that. Is that a fair or not really? Well, not really. I don't believe that the economists were deposed before trial. We'll subtract that. I guess my question was, this isn't a case where there was only one expert. Each side had an expert, I guess is what I'm trying to get. Yes, Your Honor. So, presumably, the methodology espoused by the plaintiff was the methodology used by Dr. Gardner. Is that right? Correct. Dr. Gardner explained on the stand that he took the amount that Mr. McGraw was earning at the moment of injury, basically took the day rate, multiplied it by 28 days on, 14 off, and annualized that. So there were the two divergent ways of—there were the two divergent methodologies, front and center. Correct. The jury was presented with both methodologies, and each economist explained their method of deriving their calculations, and the jury was free to agree with one and not the other or disagree with either. Probably with charts and other visuals. I believe there was some demotion of aides showing Mr. McGraw's income history. But, I mean, it was graphically presented, not just verbalized by these experts, in econo-language where a juror wouldn't be able to understand. But I'm not making light of it, but I'm assuming the jury had all these numbers with the different theories, from which it could have either chosen one or the other, or I guess come somewhere in between. Correct. And not only did each economist describe their methodology and their calculations, but Mr. McGraw, on cross-examination, was asked a lot of questions about his work history and earnings history, so the jury was well aware of his inconsistent work history from Mr. McGraw's own testimony. I'd like to get to my second point, which is the evidence supporting the jury's decision to decline any award of past lost wages. The jury was presented with two pieces of key evidence upon which it could have reasonably concluded that Mr. McGraw could easily have earned the income, replaced the income that was Dr. Boudreau's earning base. Excuse me. The jury heard that Mr. McGraw had disqualified himself from working at United Tugs by lying on his employment application. This evidence and testimony provided a basis upon which the jury could conclude that Mr. McGraw suffered no past wage loss as a result of the accident. Mitch Edmard, the owner of United Tugs, provided unrebutted testimony that McGraw disqualified himself from employment at United Tugs when he lied about his criminal history on his employment application. Mr. Edmard explained that, look, he believes in second chances. He has hired people that have criminal histories, but the unique circumstances of working in close quarters on a tugboat require that the crew members trust each other and that everyone on that boat be trustworthy. And if Mr. McGraw, when he was discovered that he had been dishonest when applying for work, that disqualified him from further employment at United Tugs. And the jury was reasonable in deciding we're not going to reward Mr. McGraw's dishonesty by issuing an award for past lost wages to replace the money he could have earned at United Tugs when he was no longer eligible to work at United Tugs. The goal of tort law is to place the plaintiff in the same position he was before the tort was committed. In this case, Mr. McGraw was not entitled to earn income from United Tugs before the incident because he lied on his employment application. By not awarding past lost wages, the jury put him back into that position. The second key piece of evidence supporting the jury's decision on past lost wages was surveillance video taken of McGraw both before and after his surgery. In each video, McGraw is seen moving about with no apparent difficulty, which leads a reasonable juror to assume that Mr. McGraw was capable of some type of gainful employment after the accident. We're not talking about going back to work offshore with United Tugs here. We're talking about the question of could Mr. McGraw have obtained some type of sedentary or light-duty job to replace the roughly $18,000, $19,000 that was his average income in the years before the accident. Mr. McGraw was not an invalid, and no doctor testified that he was totally disabled. That term, totally disabled, was used in Mr. McGraw's brief, but no doctor testified on the stand that he was entirely precluded from performing any type of gainful employment. In preparing for today's argument, I went back and reviewed all five volumes of the trial transcript. No doctor used the term totally disabled. The doctor ordered him not to go back to work on the tugboat, but he was not precluded from earning some type of income. The Leaf case cited in our principal brief makes clear that a jury is not required to render an award that is within the range advocated by the experts. In that case, the trial court rendered a lost wages award that was lower than the estimates provided by the two experts at trial, and this court held that the jury was free to render that award because it was based upon other evidence presented at trial. In that case, the evidence was that the plaintiff might be able to return to work and that he was attending college and therefore might be able to earn even more money than he was before the accident. The important line from the Leaf case was, quote, we do not require that a jury's award fall within the estimates given by expert testimony, close quote. We also cited the Comings case in our principal brief in which this court affirmed a lost wages award that was lower than the estimate provided by the economist. It was a short opinion, but the court noted that the trial court relied in part on surveillance footage showing the plaintiff moving about without restraint, which is exactly the situation presented in this case. With regard to future lost wages, the award of $100,000 was within the range presented by the party's economist. Dr. Boudreaux explained that Mr. McGraw could go back to work earning $10 an hour, which would earn him an average annual income just above the $18,800 earnings base that Dr. Boudreaux calculated. Therefore, Mr. McGraw would suffer no lost wages in the future. I want to quickly address the reference in the argument made by Mr. McGraw that the jury somehow was confused by the reference to maintenance paid after the accident. As it's required to do under the law, United Subs paid maintenance to Mr. McGraw through the date that he was pronounced MMI, and the parties reached a stipulation during trial, and that stipulation was read to the jury. The stipulation included the amount of maintenance paid. Therefore, if there was any jury confusion, it was due to Mr. McGraw's own evidence, or at least evidence presented jointly by the parties by way of stipulation. Mr. McGraw notes that defense counsel mentioned the amount of maintenance paid in closing arguments, but if you review the record, during the sidebar regarding the stipulation, defense counsel made very clear that he was going to state that amount during closing arguments, and there was no objection lodged by Mr. McGraw. Additionally, the court, Judge Zaney, properly charged his jury, instructed them that they were to award all damages to which they felt Mr. McGraw was entitled, and that included an award for past loss wages. There was never a suggestion by any witness, by any lawyer, or by the judge that any deduction should be made for the maintenance paid. The argument that the jury was confused and reduced the amount of past loss wages because they thought he had been paid maintenance is simply speculation. There's no evidence in the record to support that proposition. I'd like to close by saying this. In our system of justice, you bring your disputes before a court, you pick a jury of your peers, and you put on your evidence. After that, you live with the results, absent some grave error committed during the trial. Mr. McGraw has raised no issues that present a grave error or manifest injustice in this case, and we ask that the court affirm the trial court's judgment. Thank you. Thank you, Mr. Wray. Back to you, Mr. Falcon. A very brief methodology. This was never a do-bear challenge because Dr. Boudreau obviously has the expert qualifications to testify, and he used proper methodology. What happened was the facts that he used were inappropriate because it's not allowed by this court's precedent or FIFER. He could not use the average based on the facts of this case. What we've not heard— You fought through all that down below, though. I mean, you took your best swings at that, and I'm sure as able trial counsel you more than pointed out. What you viewed were those impediments, though, but it was all done within the jury trial, et cetera, et cetera. You haven't argued to us that there's some case that bars the methodology he uses. Dr. Boudreau, right? His methodology is correct methodology. You're just saying as applied to your client's facts. Well, no, but it's the facts that he assumed. Experts can testify if they have expert qualifications and use proper methodology, which is use the proper discount rate to follow what Culver says to do. Now, if you want to assume facts, whatever facts is given to him, and in this case the fault was using facts that had average wages. And I'm going to go back to this point because this is the very important point in this case, which they have not addressed in their briefs or their argument Martinez. All they want to do is say that because he had a history before he went to work for this company that we have to average his wages. The court dealt with this in Martinez. Judge Owen, you dealt with this in Martinez. They have not addressed it. They have not distinguished Martinez. They have not distinguished the undisputed facts of ten and a half months of service to this company after being qualified, earning the money. They've got nothing to say why did this man get his last wages from the time he was off. There's no evidence in this record to support a zero verdict for past lost wages. You didn't move for a new trial on any ground below, correct? There was no motion for a new trial raised by you on this point or any other. Is that correct? Yes, sir. We took the appeal. And on this appeal, with these facts, they have not. What we've shown by this appeal and what's in this record is there is no evidence that would support a reason to use an average wage loss. What happened in this case was we proved with unrebutted evidence, with uncontradictory evidence that he had this earning capacity, that he was earning the actual wages, $51,000 at the time he got hurt. And even if we look at after he was healed for future wages, the best he could do was $18,000 a year. That's over a $30,000 a year difference. So why is $100,000 not appropriate? Because it's already been a year and a half since then. All right. Putting aside the line on the application piece, which to me is speculative, but what do I know? But what do you do with the videos? Sir? What do you do with the videos? I do the videos? Yes, sir. Yes, sir. Well. Or what could the jury have done with the videos? What the jury cannot do with the videos is say this man could go back to work in the maritime industry because of those videos. Mr. McGraw has screws in his back. Mr. McGraw has every doctor that looks at him and says you're not going back to work in the maritime industry. What's your best case that says you are only limited to looking at maritime jobs, you can't look at employment in general? The reason it's unrebutted evidence is there's two vocational counselors who said what can this man do after his injury? And that's where the $18,000 comes from. That's the best that he can do according to the defense vocational counselor, Your Honor. So we have a difference of $51,000, which has not been rebutted, his earnings that he's had at the time, and the best he can do even according to the defense counselor of $18,000. That's $30,000 a year. It's already been over a year and a half. We're $45,000 into his future wages, and he only got $100,000 with a 21-year work-life expectancy. $100,000 is wholly inadequate. And back to the surveillance, Judge Stewart, he can't go to a job play and say, look, I've got this surveillance from when I was hurt when they were looking at me. Can you hire me because I've got some good surveillance? They're not going to hire him. He can't pass a physical. It's unrebutted testimony. He'll never go back to that type of employment. I'm not saying I'm not. I just wanted to hear. I just wanted you to address it. That's all. It was on my checklist. Because it's in the brief and the argument. It's in the brief and even the employment application. You know when the employer thought about the employment applications? I asked him. It's in the record. When did this come up? Thursday before trial because the defense lawyer brought it out. It wasn't at the time he was working for him. It wasn't the three years afterwards. When did they first learn that he'd lied? I think the Thursday before the trial. Nobody pulls these applications out of the files when you're working for him, when you're making money for him, when you're showing up regularly for your work, when you're a part of that economic team that makes this guy a lot of money. They don't go back and look at those files. This was something that came up at the very end. Your Honor, the case law is clear. It's absolutely wrong for them not to give some kind of past lost wages. For the future, they did not use what this court's mandated, the time of the injury, what he was earning, and the amount of reward was wholly inadequate. We ask you to reverse and demand for a new trial. All right. Thank you. Thank you, counsel, for your arguments and your briefs. Obviously, it was a previously tried case. The case will be submitted along with the others that we've heard today, as well as non-early argument. It'll be submitted and we'll decide it. That said, the panel will stand in recess until 9 a.m. tomorrow.